Keren Tamali Sita
25 Franklin Street, Unit 203
Essex Junction, 05452
802-307-8930 | 802-225-0476

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

| | |
|---|---|
| KEREN SITA, | Case No.: Number  2:24-CV-388 |
| Plaintiff, | |
| vs. | KS VS KH |
| KURN HATTIN HOMES FOR CHILDREN, | |
| Defendant | |

## I.   DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

## II.   COMPLAINT AT LAW

NOW COMES, Plaintiff Keren Sita (hereinafter referred to as 'Miss. Sita' or 'Plaintiff'), acting individually and as a pro se litigant, files a Complaint against KURN HATTIN HOMES FOR CHILDREN (hereinafter referred to as the 'Defendant', or 'KH').

## III.   NATURE OF THE ACTION

1.   I, the plaintiff, bring forth this case under Act 26, an act relating to repealing the statute of limitations for civil actions based on childhood physical abuse, which was signed into law by Governor Phil Scott. The relevant statute is 12 V.S.A. § 522.

2.   Under 12 V.S.A. § 522, a civil action brought by any person for recovery of damages resulting from childhood sexual or physical abuse may be commenced at any time after the act alleged to have caused the injury or condition. Importantly, the victim need not establish which specific act in a series of continuing physical abuse or sexual abuse incidents caused the injury.

3.   In this case, I assert that I was deliberately targeted and intentionally sought out to attend Kurn Hatten. A white teacher, recognizing my potential, manipulated me as a child in an attempt to persuade me to enroll in Kurn

KS VS KH - 1

Hatten—a school they knew was plagued with issues such as child abuse and eugenics. As a child with a unique light, I as a child became a helpless pawn in their manipulative and clearly racist game.

4. Furthermore, I contend that the teachers at Rick Marcotte Center School and Kurn Hatten collaborated to coerce me into attending a problematic institution. Despite my parents being new Americans, they were misled into believing that Kurn Hatten offered great academic opportunities. Regrettably, this was not the reality.

5. Upon arriving at Kurn Hatten as a sixth grader, I was placed in a living situation with eighth-grade girls. There, I was exposed to older girls engaging in sexually explicit behavior. I was coerced into self-harm and lesbian sexual activities, and I became a victim of sexual assault by fellow classmates.

6. Kurn Hatten ignored my claims, dismissing them due to my beauty, Racie, ethnicity, and KH desire to use my musical gift to advance their music program and gain donors.  I assert that Kurn Hatten is liable for the damages I suffered.

7. I, the plaintiff, also assert that Kurn Hatten High School (KH) ignored my claims due to my beauty, race and ethnicity. Furthermore, I contend that KH is liable for damages under Title IX for student-on-student sexual harassment, bullying and assault.

8. KHH has already publicly acknowledged that they know significant harm has been done to their past and current student due to administration failing to take proper steps.

9. Plaintiff clams that K H is liable under Title IX for a high school student's sexual assault of a fellow student because it occurred on KH school grounds and because the board and other academic and professional teachers employed by KH were informed of the assault after it happened and while it happened, KH is also liable for post-assault harassment.

10. My experience at KH was deeply troubling. I was deliberately targeted, and my complaints about the awful treatment I received were dismissed. The school administration was more interested in using me to enhance their music and arts department than in addressing my well-being as a child.

11. I desperately wanted to leave the school due to the relentless bullying I faced from fellow students, house parents, and white individuals who harbored animosity toward me because of beauty, confidence, my love for my parents and African race.

KS VS KH - 2

12. My desire to leave KHH Boarding School was profound and unyielding. Despite my repeated attempts to provoke expulsion through deliberate misconduct, the school administration consistently declined to take such action.

13. Due to the nature of the boarding school, each suspension resulted in my confinement on campus. The administration's refusal to release me further exacerbated my distress. I endured both physical and sexual assaults by other students and bully by adults.

14. KHH Boarding School remained steadfast in retaining my enrollment, despite my fervent appeals to leave. Their unwavering stance compelled me to explore alternative means of escape.

15. As a person of color, specifically a Black child who was giftedly brilliant, I often found myself compelled to downplay my intelligence and feign ignorance. This strategic approach allowed me to navigate the system while secretly devising a plan.

16. Recognizing that legal transgressions would prompt intervention from external authorities, I meticulously avoided any actions that would directly involve law enforcement. My primary objective was to sever ties with the institution, and I was willing to compromising my future in order to never have to be associated with KH ever again.

17. As a child, I willingly risked my personal freedom in pursuit of emancipation from the toxic environment at KHH. My determination to break free from these malevolent people who worked at KH drove me to extreme measures. I was desperate to get away.

18. KH forced me to live with older girls, aiming to strip away my childlike innocence and make me appear older.

19. They failed to see me as a child, solely because of my race.

20. KH is fully aware of the harm they have caused past and present students.

21. Unlike other students who had legal representation, I come forward with my own account, seeking legal redress for the harm inflicted upon me.

### IV. JURISDICTION

22. This action constitutes a civil rights matter that invokes federal questions under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq. ("Title IX"), specifically pertaining to student-on-student sexual harassment and assault. Discrimination stemming from Title VI of the Civil Rights Act of 1964 is also relevant.

KS VS KH - 3

23. This Court possesses original jurisdiction pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq. ("Title IX"), and Title VI of the Civil Rights Act of 1964. In this case, the federal court's jurisdiction is established under the laws outlined in 28 U.S.C. §§1331 and 1343.

## V.  VENUE

24. Venue is deemed suitable in this judicial district in accordance with 28 U.S. Code § 1391, given that a substantial portion of the events or omissions giving rise to the claim occurred within this jurisdiction.

## VI. PARTIES

25. As the plaintiff in this case, I am Ms. Keren Sita, currently 26 years old. When I first enrolled at Kurn Hattin Homes, I was a student in the 6th grade. Hereafter, I may be referred to as "Plaintiff" or "Ms. Sita". My date of birth is April 29, 1997, and I was residing in South Burlington at the time of the incident under consideration.

26. The defendant in this matter is New England Kurn Hattin Homes, previously identified as Kurn Hattin Home for Boys and The Warner Home for Girls. This nonprofit organization is based in Westminster, Vermont, and serves as a charitable institution offering home and educational services to boys and girls aged between 6 and 15 years. The principal address is 708 Kurn Hattin Rd, Westminster, VT 05158.

## VII.FACTUAL BACKGROUND

27. Although my time at KH was when I was younger, I do have very strong memories of it. Although my memory is lacking, it is the truth. As Judge Judy would say, you don't need to have a good memory to tell the truth.

28. In March 2018, I, Keren, was nearing the end of my 4th grade and approaching the beginning of my 5th grade at Rick Marcotte Central School.

29. During this time, I was approached by a couple of teachers from Rick Marcotte Central School who introduced me to a brochure about KH Boarding School, mainly my ESL teacher.

30.  This brochure portrayed KH Boarding School as a highly prestigious and sought-after academic institution, sparking my interest as a young student. They knew I was a brilliant child and used it as a form of manipulation.

31. Fascinated by the idea of attending a prestigious and cool boarding school akin to what I had seen on TV shows like Zoey 101, I delved deeper into the opportunities that KH Boarding School purported to offer.

32. The teachers informed me that in order to secure a spot at KH Boarding School, I would need to undergo multiple interviews, submit applications, and participate in tours of the school facilities.

KS VS KH - 4

33. However, I don't distinctly recall the absence of children during these tours, as the classrooms and facilities appeared vacant.

34. The teachers and admission team at KH Boarding School presented the institution as a miniature version of Harvard, highlighting the abundance of educational opportunities and activities available to students.

35. At the time, I was not familiar with the concept of eugenics, and none of the staff members attempted to explain this to me or caution me about any potential concerns relating to KHH. They painted the KH as a picture place. Which was part of the manipulation.

36. Impressed by my intelligence, housing style of the cottages, and opportunities, the teachers and admission team at KH Boarding School seemed eager to have me as a student.

37. Despite my initial reservations about living with white people and my skepticism towards white people is due to previous inactions with white people and as a young child I knew white people could never be trusted.

38. However, the allure of attending a prestigious school outweighed my concerns as I saw it as an opportunity for personal growth and exposure to a different environment.

39. Upon receiving acceptance into KH Boarding School, my excitement mounted.

40. The prospect of living with girls my own age, away from older siblings with whom I struggled to connect, seemed promising.

41. The school administration emphasized the full boarding school experience, highlighting that girls and boys were segregated on different sides of the campus and that my interactions would primarily be with girls my age.

42. However, my perception began to shift upon my first time.

43. meeting Mr. Tom Fahner, the principal at KH Boarding School. During our encounter, I felt a sense of discomfort as he gazed at me intently, leaving me with an uneasy feeling. Despite this, I remained committed to the idea of attending the school.

44. Several months later, my excitement turned to disappointment when I was informed of being waitlisted, despite having received an initial acceptance.

45. The waitlisting further falsely reinforced the notion of exclusivity and prestige surrounding KH Boarding School, positioning me as one of the fortunate few granted such an opportunity.

KS VS KH - 5

46. I harbored feelings of being different and somewhat misunderstood from the people in my life, and held a deep-rooted mistrust of white people due to persistent letdowns and I felt excited to connected with student that all weren't from South Burlington.

47. The school social worker, Matt McNeil, and various Department of Children and Families (DCF) personnel frequently described me as a gamine little girl, perpetuating my belief that white individuals in my life were engaging in manipulative behavior.

48. I felt compelled to prevent any attempts at manipulation in order to uphold my plans. I told myself as a young child that I was willing to break the rules in a the games these white people in my life were playing because it was my life they were playing with.

49. Through these experiences, I have come to believe that the school administration at Rick Marcotte Central School aimed to detach me from my African heritage and influence me towards seeking white approval and constants white surveillance of my growth, thus fostering a sense of self-doubt and disconnect from my African roots.

50. My supportive family, comprising a loving father and a strong African mother who serves as my inspiration, further compounded my belief that the school administration sought to diminish my connection to my African identity.

51. I began my 6th grade at a local middle school in South Burlington, as I awaited a resolution regarding my status at KH Boarding School.

52. I affirm that around the middle of my life experiences, I was transferred to KH, and that's when I first came to reside at Dickinson Cottage

53. It was there that I encountered my house parents, Miss Kristen and Miss Katie. Upon my arrival, I was informed that typically, Warner Cottage was designated for girls my age, but I was assigned to live at Dickinson Cottage who were predominantly 8th graders and 7th graders.

54. However, it turned out that our cottage was mostly composed of 8th graders, with only another girl named Ashley and myself as 6th graders.

55. I began to suspect that the reason behind my placement in Dickinson Cottage was due to the fact that it housed the other black girls on the premises—two sisters and myself.

KS VS KH - 6

56. This strategy, I believe, was devised to assuage my unease about being around white girls, as I had shown reluctance in previous interactions with befriending white girl, largely due to my strong African background and the problem white girl come with.

57. One significant encounter in the cottage involved Elizabeth, a deeply insecure African girl who exhibited immediate jealousy towards me due to my appearance.

58. Despite sensing the tensions between us stemming from her envy, I opted to navigate this situation as I considered it preferable to contend with a fellow black girl's jealousy rather than face the manipulative and malicious behaviors that often manifest when white girls harbor jealousy toward me as a black girl.

59. My room was situated as the first one along the hallway, directly across from Miss Kristen's secondary door.

60. The setup of the cottage included one houseparent living there 24/7, while another would only be present on specified workdays.

61. Miss Kristen, the houseparent with whom I interacted more frequently, was a 300-pound white woman who exhibited profound and pronounced insecurity and regularly targeted me for reasons I found unjust due to me being child.

62. Miss Kristen, weighing 300 pounds, lacked self-care and targeted young girls like me who she deemed conventionally attractive, resorting to bullying.

63. Miss Kristen's bias towards me was evident in her differential treatment, such as preventing me access to clothes and accessories, an area of personal interest and self-expression for me.

64. However, this favoritism sometimes took a negative turn, with instances of deliberate confiscation of my clothing or disruptions to my grooming routine — seemingly intended to inhibit my pursuit of enhancing my appearance.

65. Living amid 8th-grade girls intensified my exposure to discussions and experiences typically reserved for those more mature in age.

66. This environment contributed to my prematurely grappling with issues like body image and relationships, as well as other complex emotional matters.

67. Miss Kristen often fostered animosity between me and other black female residents, particularly Elizabeth and Anna, fueling discord based on factors like background and appearance.

KS VS KH - 7

68. Furthermore, I voiced my discomfort with Miss Kristen's pet cat, Cinnamon, whose hostile demeanor troubled me.

69. Registering complaints about the cat only seemed to agitate Miss Kristen further, leading to escalated mistreatment on her part.

70. Her approach was authoritarian and belittling, underscored by tendencies of bullying and favoritism.

71. The internal dynamics of the cottage, characterized by interactions with older peers and their intricate relationships, precipitated a stark departure from my previously sheltered existence.

72. I found myself entangled in peer pressures and semblances of lesbian relationships — an unfamiliar territory that clashed with the conservative values instilled by my upbringing.

73. Despite feeling compelled to conform to fit in, I harbored an inner awareness of the dissonance between my true self and the facade I felt compelled to embody in a bid for acceptance.

74. As a 6th grade girl, I found myself in a distressing situation where I was coerced and manipulated by 8th grade girls to engage in sexual behaviors that I had never before encountered.

75. It is important to mention that I am not a lesbian, nor have I ever been attracted to girls.

76. Prior to attending KH, I had never engaged in any sexual activities and maintained a pure and innocent outlook on relationships.

77. The older girls at KH targeted me due to my perceived prettiness and vulnerability, believing that they could control and influence me due to my age and naivety.

78. Living amongst 8th grade girls further pushed me into an environment where I felt pressured and uncomfortable, ultimately leading to an obsession with boys, something foreign to me prior to my time at KH.

79. The girls in question were known for their sexually explicit behaviors as they had previously faced disciplinary action for sneaking out and engaging with boys from the school.

80. The sexual assault that transpired involved me being manipulated into engaging in inappropriate conduct with these older girls, an experience that deeply disturbed me and went against my beliefs and values as a Christian.

81. The pressure exerted upon me as the youngest and most attractive black girl in the dorm was overwhelming, leading to a sense of powerlessness and distress.

82. Persistently sharing my distress with school authorities and therapists yielded negligible intervention or support, compelling me to contemplate drastic measures to extricate myself from this oppressive environment.

KS VS KH - 8

83. Strategizing an exit strategy involved acts of defiance designed to provoke a response that would force the school's hand in removing me.

84. Additionally, the faculty at KH, particularly Mr. Fahner, played a role in creating a hostile environment.

85. Mr. Fahner's inappropriate behavior, including making uncomfortable eye contact and creating an unwelcome atmosphere, only added to the trauma I experienced.

86. The school, despite being aware of the explicit behaviors of the older girls, failed to protect me as a vulnerable student, and instead, allowed a culture of sexualization and harassment to thrive.

87. Ultimately, it was my calculated misstep at a Walmart in New Hampshire in which I intentionally pilfered an eyeliner, that served as the catalyst for my departure from KH.

88. This rash decision was fueled by a profound sense of desperation arising from enduring mistreatment, emotional manipulation, and a pervasive sense of systemic neglect toward my well-being.

89. The series of distressing events and harrowing experiences throughout my tenure at KH serves as a testament to the toxic environment that exacerbated my distress and compelled a drastic response to secure my release.

90. I grappled with forces beyond my control, encountering a spectrum of abuse, neglect, and manipulation that left me with no recourse but to engineer my own escape from the confines of Dickinson Cottage and the afflictions it bore upon me.

91. Therefore, I bring this lawsuit not only to seek justice for the sexual assault I endured but also to hold KH accountable for its lack of action in safeguarding its students from such reprehensible behaviors.

92. I was a victim of manipulation, coercion, sexual assault and sexual harassment, and it is my belief that through legal recourse, I hope to prevent such injustices from happening to others in the future.

<u>**CAUSE OF ACTION**</u>

**1.   COUNT ONE:**

**VIOLATION OF UNDER TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C.S.**

**§ 1681 ET SEQ**

93. Plaintiff hereby incorporates and realleges Paragraphs 1 through 92, as though fully set forth at length herein

94. In *Davis*, the Supreme Court held that in order to establish a claim based on student-on-student sexual harassment under Title IX, a plaintiff must demonstrate that: (1) the alleged harassment was so severe, pervasive, and objectively offensive that it deprived the plaintiff of access to the educational opportunities or

KS VS KH - 9

1  benefits provided by the school; (2) the funding recipient had actual knowledge of the sexual harassment; and

2  (3) the funding recipient was deliberately indifferent to the harassment. *Davis, 526 U.S. at 633, 119 S.Ct. 1661*

3  95. Defendant, KH, as a recipient of federal funds, is legally bound to uphold the provisions set forth in Title IX,

4  which prohibits discrimination on the basis of sex in educational programs receiving federal financial

5  assistance.

6  96. KH had an explicit duty to prevent and address instances of student-on-student sexual harassment to ensure a

7  safe and supportive learning environment for all students.

8  97. In the present matter, Plaintiff claims that Defendant, KH, failed in its duty to prevent and address student-on-

9  student sexual harassment. Due to the layout of the boarding school, Plaintiff, a sixth-grade student, was

10  unfairly placed in living quarters with eighth-grade girls, leading to exposure to severe and pervasive gender-

11  based mistreatment.

12  98.  This conduct was so offensive and harmful that it deprived Plaintiff of access to a safe and supportive learning

13  environment, essential to the purpose of Title IX.

14  99. The environment created by KH's deliberate indifference and failure to exercise control over the incidents of

15  sexual harassment and assault had a significant impact on Plaintiff.

16  100. The repeated instances of harassment, which were known to the school administration, resulted in emotional

17  distress, self-harm behaviors, and a decline in academic performance.

18  101. Plaintiff continually sought ways to escape the harassment, resorting to disruptive behavior in a desperate

19  attempt to distance oneself from the traumatic experiences faced within the school environment.

20  102. Moreover, KH's public acknowledgment of sexual assault and harassment incidents at the institution reinforces

21  the premise that Defendant was aware of such occurrences and failed to take effective measures to address and

22  prevent further instances.

23  103. This lack of action by KH demonstrates a critical failure to protect students from harm and maintain an

24  atmosphere conducive to learning.

25  104. As a direct result of Defendant's violations of Title IX and its failure to provide a safe and non-discriminatory

26  environment, Plaintiff sustained significant damages.

27

28

KS VS KH - 10

105. These damages include but are not limited to severe emotional distress, disruption of educational opportunities, self-inflicted harm, and the overall denial of the benefits that Title IX ensures. Plaintiff seeks relief and accountability for the harm endured as a consequence of Defendant's actions.

106. In the present case, Plaintiff satisfies the elements outlined in *Davis v. Monroe County Board of Education* to establish a claim based on student-on-student sexual harassment under Title IX:

107. **Severe, Pervasive, and Objectively Offensive Harassment:** Plaintiff experienced sexual harassment and assault that were severe, pervasive, and objectively offensive. As a 6th-grade student at KH, Plaintiff was subjected to severe and pervasive sexual harassment by 8th-grade girls, leading to emotional distress and a hostile educational environment. The harassment extended beyond mere sexual abuse to include bullying and coercion into engaging in inappropriate behavior. This conduct not only deprived Plaintiff access to educational opportunities but also resulted in physical and emotional harm, significantly affecting my well-being. The offensive nature of the harassment stemmed from the targeted nature of the abuse towards Plaintiff due to my beauty, religious beliefs and personal charisma.

108. **Actual Knowledge of Sexual Harassment**: KH, being the funding recipient, had actual knowledge of the sexual harassment and assault occurring on campus for years. KH had actual knowledge of the sexual harassment and assault transpiring on campus, as Plaintiff reported incidents to school authorities, indicating institutional awareness of the ongoing misconduct. Additionally, the public acknowledgment by KH of past instances of sexual assault and harassment further solidifies the school's awareness of such issues within its premises.

109. **Deliberate Indifference**: Despite being aware of the sexual harassment and assault, KH demonstrated deliberate indifference by failing to take appropriate action to prevent further harm to Plaintiff and ensure a safe educational environment. The repeated instances of misconduct, coupled with the school's inaction, highlight KH's indifference to the serious Title IX violations happening within its walls. Again, despite being aware of the severe harassment and assault towards Plaintiff, KH exhibited deliberate indifference by failing to take proactive measures to address and prevent further harm because they wanted to use the plaintiff to advance their own music program and increase diversity. My persistence cry for help KH kept ignoring me and which resulted in self-harming behaviors as a sixth grader should have prompted KH to intervene and provide a safer environment for Plaintiff.

110. The school's decision to keep Plaintiff in an environment that exacerbated my distress, instead of ensuring placement with younger students more aligned with my age group, indicates deliberate indifference towards my well-being as a student.

111. Defendant KH conduct were malicious, wanton, willful, oppressive, and/or exhibited a reckless indifference to my rights under Title IX and safety both physically and emotionally such that an award of punitive damages is warranted.

112. By meeting these elements set forth in Davis, Plaintiff establishes a strong case for violation of Title IX regulations by demonstrating the severity of the harassment, KH's actual knowledge of the misconduct, and KH's deliberate indifference towards addressing and preventing the harassment experienced by Plaintiff.

113. Title IX liability for student-on-student sexual harassment is limited "to circumstances wherein the [funding] recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis, 526 U.S. at 645, 119 S.Ct. 1661.*

114. Plaintiff claims KH created a hostile environment that interfered with my educational opportunities.

115. Plaintiff claims a reasonable jury could find that the Defendant KH was given adequate notice of the assault and harassment at the time.

116. As a plaintiff representing myself in this pro se lawsuit, I reflect on the troubling experiences I endured during my time at KH. While attending the school, I was subjected to physical assault by 7th and 8th grade girls—a situation that would never have occurred within the confines of my local middle school.

117. Unaccustomed to interacting with older girls, I found myself unprepared to confront the 8th graders who targeted me and engaged in constant bullying. Despite my lack of prior interactions with older girl, they chose to physically assault me, manipulate me in conduct I would never do.

118. Moreover, these girls engaged in sexually explicit behavior at Dickson Cottage, a location known to KH for housing girls and the school authorities.

119. Despite the clear awareness of these incidents, the professors, teachers, and houseparents at KHI demonstrated a disconcerting lack of intention to support or aid me in these trying circumstances. The severity of the harassment surpassed conventional bullying, leaving me unequipped to navigate such distressing situations as a 6th grade student.

KS VS KH - 12

120. Consequently, I felt compelled to take drastic measures to extricate myself from this hostile environment. Resorting to disruptive behavior in class and even violating law.

121. Defendants employee were all fully aware of the relevant facts and circumstances yet deliberately violated various KH policies and state law even when Defendants were apprised of such policies and as full time guards of child they were aware of the law and the rule but deliberately choose to ignore the laws because the employees at KH are white low class sadistic satanic child abuser and child targeters.

122. To wit, defendant KH directly failed to take steps to prevent conduct that posed a dire and foreseeable risk to the plaintiff as one of their students.

123. As a result of the injury sustained by Plaintiff due to defendant KH violations of Title IX, Plaintiffs have suffered and/or will continue to suffer the following damages:

a) Past and future costs for retail therapy and Bibliotherapy and self-care; b) Permit loss of enjoyment of life due to Childhood trauma; c) Past and future pain and suffering, inconvenience and emotional distress.

124. WHEREFORE, Plaintiffs demand judgment for this first cause of action against defendants in the amount of Ten million dollars ($$10,000,000), exclusive of interests, court fees, any potential attorney consulting fees and costs.

### 2.   COUNT TWO:

### NEGLEGENCE AND NEGLEGENCE SUPERVISION

### BASED UPON THE DOCTRINE OF RESPONDEAT SUPERIOR

125. Plaintiff hereby incorporates and realleges Paragraphs 1 through 125, as though fully set forth at length herein.

126. Defendant, KH Boarding School, breached their duty by failing to provide a safe and secure environment for the Plaintiff, resulting in negligence and gross misconduct.

127. Specifically, the Defendant failed to properly supervise the students, address instances of manipulation, coercion, sexual assault, and sexual harassment, creating an environment that facilitated abusive behaviors towards the Plaintiff.

128. Defendant, KH Boarding School, breached their duty by failing to provide adequate supervision and safeguarding measures for students, leading to gross misconduct and negligence and negligence supervision.

129. The Defendant's failure to address manipulation, coercion, sexual assault, and sexual harassment within the school premises amounts to a breach of their duty of care towards Plaintiff.

KS VS KH - 13

130. As a direct result of the Defendant's negligent conduct, Plaintiff has suffered significant damages including severe emotional distress, trauma, psychological harm, a breach of trust, and a betrayal of expectations of a safe educational environment.

131. Plaintiff suffers from nightmares of what occurred from my experience at KH.

132. After attending KH Plaintiff has been attended to by a psychiatrist and therapist since the age of 13 who has diagnosed Plaintiff as suffering from depression and anxiety because the childhood trauma at KH.

133. Additionally, Plaintiff has experienced a disruption to my childhood innocence, a loss of a sense of security, and enduring psychological injuries that warrant compensation.

134. Defendant KH had a duty to properly supervise all their employees and ensure they were actively protecting their students Defendant KH failed to properly supervise all of their employees to make sure that students like myself were harm while we were under their care.

135. As a result of all Defendants failure to properly investigate Plaintiff's claims of abuse, negligence, mean treatment of the houseparents, and removing me from these older girl who wanted to intentionally harm me, Plaintiff was harmed.

136. Defendant KH conduct was intentional malicious, wanton, willful, oppressive, and/or exhibited a reckless indifference to my rights as a student and my safety as a young African girl living with older girl such that an award of punitive damages is warranted.

137. Defendant KH is vicariously liable for the negligent acts, commissions, or omissions of its employees and/or agents who were was at all times relevant here to acting on behalf of defendant KH and within the scope of their employment with defendant KH, under the doctrines of respondeat superior and ostensible agency.

138. Defendant employee were all fully aware of the relevant facts and circumstances yet deliberately violated various KH policies and state law even when Defendants were apprised of such policies and as full time guards of child the were aware of the law and the rule but deliberately choose to ignore the laws because the employees at KH are white low class sadistic satanic child abuser and child targeters.

139. At all relevant times, defendant KH had a duty to act in accordance with the standards the laws of the govern the state of Vermont, and the rules of KH that make clear that child harming is prohibited and to act as a reasonable corporation would under the same or similar circumstances.

KS VS KH - 14

140. To wit, defendant KH directly failed to take steps to prevent conduct that posed a dire and foreseeable risk to plaintiff as a student at KH.

141. As a result of the injury sustained by Plaintiff due to defendant KH's negligence and negligence supervision, Plaintiffs have suffered and/or will continue to suffer the following damages: a) Past and future costs for retail therapy and bibliotherapy; b) Temporary and permeant loss of enjoyment of life; c) Past and future pain and suffering, inconvenience and emotional distress.

142. WHEREFORE, Plaintiffs demand judgment for this second cause of action against defendants in the amount of Ten million dollars ($$10,000,000), exclusive of interests, court fees, any potential attorney consulting fees and costs.

### 3.   COUNT THREE:

**INTENTIONAL AND MALICIOUS INFLICTION OF EMOTIONAL DISTRESS/ MENTAL ANGUISH**

143. Plaintiff hereby incorporates and realleges Paragraphs 1 through 142, as though fully set forth at length herein.

144. Defendants at KH Boarding School engaged in conduct that amounted to intentional infliction of emotional distress toward the plaintiff.

145. The conduct of Defendants, specifically the teachers and admission team at KH Boarding School, including the principal Mr. Tom Fahner, and the houseparent Miss Kristen, among others, led to a series of distressing events and harrowing experiences that facilitated an environment of emotional manipulation, racial bullying coercion, sexual assault, and harassment.

146. The deliberate actions and inactions of the defendants fostered a toxic atmosphere that exacerbated the plaintiff's distress and ultimately prompted a calculated misstep resulting in plaintiff's departure from the boarding school.

147. Plaintiff suffered unimaginable emotional turmoil, manipulation, coercion into engaging in sexual behaviors, targeted harassment, mistreatment, differential treatment based on race and physical beauty and appearance, isolation, discomfort, bullying, and neglect of well-being as a child.

148. These relentless actions over an extended period inflicted severe emotional distress on the plaintiff, breaching the duty of care owed to a vulnerable student under KH guardianship.

149. Defendants' actions not only failed to protect Plaintiff but also contributed to a culture that permitted and sustained the sexualization, harassment, and abuse of students.

KS VS KH - 15

150. Despite being aware of the distressing situations faced by the plaintiff and other students, the defendants neglected to intervene, thereby causing significant emotional harm and perpetuating a hostile, unsafe environment for Plaintiff which greatly affect plaintiff life trajectory and academic life.

151. The intentional and malicious infliction of emotional distress by the defendants, as described in detail throughout the narrative past student have already public relinquished, warrants legal action to hold KH accountable for their egregious behavior and the resulting psychological trauma suffered by the plaintiff.

152. The trauma Plaintiff endured was so serious that I was willing to risk my liberty as a citizen in order to remove myself from KH and the toxicity that drowns that God forsaken school.

153. Plaintiff has been attended to by a psychiatrist who has diagnosed Plaintiff as suffering from depression from the childhood trauma Plaintiff endured will being a student at KH and social anxiety because of the incidents of abuse and intentional infliction of emotional distress.

154. Since I left KH, I have never been able to make friends with white girls, and never could I have a relationship with white people. For after what I experience at KH as a child, I was convinced that white people are all evil and it is a feeling I find utterly impossible to shake off as a grown adult.

155. Because I am black and an immigrant, I was intentionally targeted, and they needed to advance their wicked agenda that is why they refused to let me go from the school.

156. Even though I made it clear that I did not believe that KH was a good fit and they ignored me because I was a diversity hire and they needed that and didn't care what harm was happening to me.

157. Plaintiff suffers from headaches, insomnia, sexual dysfunction, fatigue, and prone to overeating and gaining weight when I think about what these evil people at KH did to me and more.

158. Defendant KH conduct was intentional malicious, wanton, willful, oppressive, and/or exhibited a reckless indifference to my rights as a student and my safety as a young African girl living under their care both physically and emotionally such that an award of punitive damages is warranted.

159. Defendant KH are culpable for Plaintiff's injuries resulting from their infliction of emotional distress upon Plaintiff.

160. To wit, defendant KH directly failed to take steps to prevent conduct that posed a dire and foreseeable risk to plaintiff as a student at KH.

KS VS KH - 16

161. As a result of the injury sustained by Plaintiff due to defendant KH intentional infliction of emotional, Plaintiffs have suffered and/or will continue to suffer the following damages: a) Past and future costs for retail therapy and bibliotherapy; b) Temporary and permeant loss of enjoyment of life; c) Past and future pain and suffering, inconvenience and emotional distress.

162. WHEREFORE, Plaintiffs demand judgment for this third cause of action against defendants in the amount of Ten million dollars ($$10,000,000), exclusive of interests, court fees, any potential attorney consulting fees and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

163. Judgment for the first cause of action against the defendants in the amount of Ten million dollars ($10,000,000) in compensatory damages, exclusive of interests, court fees, attorney consulting fees, and costs.

164. Judgment for the second cause of action against the defendants in the amount of Ten million dollars ($10,000,000) in compensatory damages, exclusive of interests, court fees, attorney consulting fees, and costs.

165. Judgment for the third cause of action against the defendants in the amount of Ten million dollars ($10,000,000) in compensatory damages, exclusive of interests, court fees, attorney consulting fees, and costs.

166. Plaintiff also seeks punitive damages of Thirty million dollars ($30,000,000) from the defendants.

167. Kurn Hatten, is it despicable academic institutionalism using the cover of a boarding school to target children with potential and drain them of all their abilities, leaving them as helpless, traumatized adults? Out of all my classmates, I am the only one who has partially succeeded, and I believe it is because I have valued my life. Meanwhile, my classmates are struggling with drug addiction, unable to attend college, and raised by single mothers. This is a result of the trauma they experienced at KH, and it is imperative that this institution be held accountable for their actions.

### PRO SE PLAINTIFF'S PLEA: NAVIGATING LEGAL TERRAIN

168. I, the Plaintiff, have submitted this case pro se, representing myself in this legal matter. As I navigate the intricacies of formulating and presenting this lawsuit without legal representation, my language usage has naturally shifted from the first person to the traditional third person format.

KS VS KH - 17

169. In embracing the role of a pro se litigant, I acknowledge the challenges and responsibilities that accompany this endeavor. Through this process, I am actively learning and adapting to the expectations and procedures of the legal system. My aim is to engage with diligence and commitment, striving for a just resolution in this case.

170. Before realizing that it was my destiny to become a lawyer, it has now clear that KH intentionally concealed their long and recorded history of child abuse from me in a calculated effort to lure me into becoming a student. KH, alongside other blatantly racist white individuals surrounding me, perceived me and knew I as a young girl brimming with endless potential and sought to separate me from my mother with the ultimate aim to extinguish and nullify my capabilities and potential. Blessed with special gifts since birth, akin to the stories of Moses and Jesus, they sought to snuff out my potential during childhood to obstruct my success as an adult. Just as they attempted to end the lives of Moses and Jesus in their infancy, they also endeavored to obliterate any chance of me coming into realization of my life purpose.

171. If the court were look at the lives of those of KH's student body, they would realize that that I am among the fortunate few who managed to break free from the clutches of that institution through my brilliance of hatching a plan to get out ot that school and the grace of God, allowed for me to subsequently return to a semblance of normalcy and back to my real life.

172. Tragically, my peers from that setting have been ensnared by the grips of drug abuse, rampant single motherhood, and a slew of other detrimental afflictions. Alas, even though I have managed to distance myself from KH, its impact still lingers in my life. Having endured abused, sexual assault and manipulation at the hands of a white woman, I harbor a profound aversion towards white women who perpetrate such despicable acts upon children and through my experience at KH I learned the cruelty and evilness of white people. And growing up in a white state with mostly white people once you understand just how wicked white people can be it is impossible to go back.

173. This personal anguish has led me to develop a deep-seated disdain towards white women, and white people and those who harm the innocent. After KH I was never befriended white girl and I do not like I can ever in my life, I can be friendly with them but I can never see myself considering a white women or person a friend.

174. As a young black girl in sixth grade, not known for partaking in any unlawful activities, I found myself willing to engage in such actions as a desperate attempt to remove myself from that school, which will forever be known by its malevolence. They sought a token black pretty young girl, and sadly, that role fell upon me. I was

KS VS KH - 18

seen as African and not raised by white people, merely a checkbox for them to include black children without regard for the damage inflicted.

175. Therefore, I humbly request the Court's understanding and the Defendant's cooperation as I continue to navigate this legal journey with diligence and respect for the principles of justice.

Dated this eleventh day of April, 2024

April 11, 2024

KEREN SITA

KS VS KH - 19